OPINION OF THE COURT
Kaye, J.
In a close corporation, the terms of a, shareholders’ *741 agreement governing a voluntary sale of stock by a shareholder to the corporation do not dictate the "fair value” of a minority interest under section 1118 of the Business Corporation Law. The Appellate Division order directing a sale on the terms fixed by the shareholders’ agreement at issue here, with no hearing and no evidence on valuation, should therefore be reversed and the case remitted to Supreme Court for a determination of the fair value of petitioner’s interest and other terms of the purchase by the corporation.
In the early 1960’s, petitioner cofounded a photography business that ultimately became respondent Pace Photographers, Ltd. (Pace). Over the decades, Pace grew from a basement operation to a major commercial photography studio with annual sales exceeding a million dollars. In 1975, the business was incorporated and, on November 10, 1982 — on the occasion of taking in a fifth shareholder — a shareholders’ agreement was signed. Under that agreement, petitioner— who owned 26% of the company’s 100 outstanding shares— became president.
The agreement committed the five shareholders to a period of continuity by providing that none of the parties "shall sell, hypothecate, transfer, encumber or otherwise dispose of any of his shares of the Corporation * * * without the written consent of all the parties hereto for a period of five (5) years from the date of this Agreement” (para 12). A sale[1] might be made within those first five years, but only to the other shareholders, at a deep discount: "Notwithstanding the provisions of this paragraph in the event a stockholder desires to sell his shares of the stock to the other stockholders within the first five years of this Agreement, he shall not be restricted, provided however, the price to be paid shall be one-half of the formula as set forth in paragraph 15” (para 12 [e]).
In paragraph 14 of the shareholders’ agreement, the parties stipulated that because the actual value of a stock interest in Pace was difficult to ascertain, they would agree upon "the value of each party’s stock interest in the Corporation for the purpose of determining the purchase price to be paid for the interest of any party hereto who is retiring or withdrawing from the business”. Paragraph 15 specified that, in schedule *742 A, a value would be fixed for the entire stock interest of the company, and that value would be redetermined at the end of every four-month period. Until a new value was entered in schedule A, however, the last stated value would control. Schedule A in the November 10, 1982 agreement set the total value of Pace at $400,000; that value was never updated. The final term of the shareholders’ agreement relevant to the present dispute is paragraph 18: "Upon the sale of shares as herein provided,” the selling stockholder for a period of three years from the date of the sale would not engage in, or in any manner become interested in, any business, trade or occupation similar to the one conducted by Pace within a 50-mile radius of the company’s then office in Brooklyn.
Barely three years after the shareholders’ agreement was signed, a rift developed between petitioner and the other four shareholders, culminating on October 7, 1986 in petitioner’s written offer to buy them out for $440,000. Of that amount, petitioner offered $175,000 to each of the other two shareholders whose stockholdings matched his. They refused.
One month later, on November 13, 1986, petitioner commenced a proceeding to compel judicial dissolution of Pace pursuant to Business Corporation Law § 1104-a. He alleged that the other four shareholders had improperly taken control of Pace, and that they were guilty of illegal, fraudulent and oppressive action toward him, and guilty of waste, mismanagement and diversion of corporate assets. At a shareholders’ meeting November 17, 1986, petitioner was replaced as president and removed as a director. By letter dated November 21, 1986, respondent elected to purchase petitioner’s shares as follows:
"We have received a copy of your Petition for Dissolution under Section 1104-A of the Business Corporation Law of the State of New York. Pace construes your action as an offer to sell your 26-% shares of common stock of Pace ('the Shares’). As you know, such an offer is governed by an Agreement between the undersigned and yourself, dated November 10, 1982 ('the Agreement’) * * *
"Pace hereby elects to purchase the Shares under the terms and provisions of the Agreement, or in the alternative under Section 1118 of the Business Corporation Law, at its 'fair value’, which the Agreement establishes as being fifty (50%) percent of the amount set forth in Paragraph 15 of the Agreement. Accordingly, under the terms of the Agreement or *743 under Section 1118 of the Business Corporation Law, Pace elects to purchase all of your shares for the sum of $53,340.00.
"This election to purchase is without prejudice to the rights of the undersigned pursuant to the Agreement.”
On December 15, 1986 — some three weeks after the election to buy petitioner’s shares — respondent both answered the petition and made a cross motion. In its answer, respondent denied all impropriety, counterclaimed for damages caused by petitioner’s own wrongdoing, and sought a declaration that petitioner was bound by the valuation established in the agreement — a price of $53,340 for his shares; alternatively, respondent requested a stay pending the determination of fair value under section 1118; and it sought enforcement of the restrictive covenant contained in the agreement. In its cross motion, respondent requested dismissal of the petition on the ground that the buy-out provision of the shareholders’ agreement was the exclusive method by which petitioner could dispose of his shares — at a price of $53,340; alternatively, pursuant to Business Corporation Law § 1118, respondent sought a stay of the dissolution proceeding and a determination of the fair value of petitioner’s shares in accordance with the shareholders’ agreement. The cross motion was supported by an extensive affidavit detailing petitioner’s wrongdoing, including promotion of his private photography business, inattention to the business of Pace, and sexual harassment of employees, and charging that the dissolution proceeding was merely an effort to circumvent the buy-out provisions of the agreement as well as the restrictive covenant.
Supreme Court denied the petition for dissolution and granted the cross motion, finding from the motion papers alone that there was no proof of the alleged misconduct toward petitioner; that the petitioner himself was the wrongdoer, having abandoned his obligations to respondent and embarked on a course of activity against its economic interests; and that respondent’s actions were the result of petitioner’s bad faith, injurious conduct.[2] Recognizing that respondent had elected to purchase petitioner’s stock pursuant to Business Corporation Law § 1118, and to have the court fix the fair *744 value of petitioner’s shares as of the day prior to filing the petition, the court further concluded that the fair value of petitioner’s stock was that agreed to in the shareholders’ agreement — $53,340—to be paid over a five-year period in accordance with a prior provision of the agreement (para 12 [d]). Finally, in the judgment (though not in the decision), the court held petitioner bound by the restrictive covenant.
The Appellate Division affirmed as to fair value, without reaching the issue of who wronged whom. In light of respondent’s election under Business Corporation Law § 1118, the court perceived that the value of petitioner’s shares was the sole remaining question in the case; respondent’s election made it unnecessary to conduct any hearing on petitioner’s allegations of misconduct. Noting that petitioner protested the fairness of the valuation under the agreement, the court nonetheless agreed with the trial court that petitioner should be bound by the unambiguous value fixed in the shareholders’ agreement, which had been voluntarily entered into by all shareholders. The court, moreover, found that it was proper to enforce the restrictive covenant, in that it was reasonable in scope and duration. We now reverse.
Threshold Issues Concerning Respondent’s Election
Prior to 1979, minority shareholders in close corporations who suffered abuse at the hands of the majority lacked the options available to business partners and shareholders in public corporations to extricate the value of their investments. To preserve and protect the interests of minority shareholders in such situations, the Legislature in 1979 provided a mechanism — a petition for dissolution — by which holders of at least 20% of the outstanding shares of a corporation whose stock is not traded on a securities market could salvage the value of their investments. Section 1104-a of the Business Corporation Law sets forth two possible grounds for such a petition: that those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders, and that the property or assets of the corporation are being looted, wasted or diverted for noncorporate purposes by those in control.
Concomitantly, the Legislature provided a defensive mechanism for the other shareholders and the corporation, giving them an absolute right to avoid the dissolution proceedings and any possibility of the company’s liquidation by electing to *745 purchase petitioner’s shares at their fair value and upon terms and conditions approved by the court (Business Corporation Law § 1118 [a]). Whatever the true facts regarding oppression or wrongdoing, the corporation and the remaining shareholders have the unconditioned right within 90 days of the petition (and later within the court’s discretion), to avoid the potential drain and risk of dissolution proceedings by simply offering to buy out the minority interest; the minority is protected by a court-approved determination of fair value and other terms and conditions of the purchase. (See generally, Davidian, Corporation Dissolution in New York: Liberalizing the Rights of Minority Shareholders, 56 St John’s L Rev 24 [1981].)
This appeal raises several threshold procedural questions concerning the combined operation of sections 1104-a and 1118.
The first question concerns the interplay between the factual allegations of abuse required for an 1104-a petition and the election to buy under 1118. Respondent urges that petitioner was not the victim but the perpetrator of abuse, and that he has invoked 1104-a solely to sidestep the buy-out provisions and restrictive covenant of the shareholders’ agreement. As we noted in Matter of Kemp & Beatley (Gardstein) (64 NY2d 63, 74), it would contravene the remedial purpose of the statute to permit its use by minority shareholders merely as a coercive tool. "[T]he minority shareholder whose own acts, made in bad faith and undertaken with a view toward forcing an involuntary dissolution, give rise to the complained-of oppression should be given no quarter in the statutory protection.” (Id.; see also, Matter of Dubonnet Scarfs, 105 AD2d 339, 343.) Petitioner, on the other hand, urges that the hotly disputed factual issues underlying the petition should not have been determined in this special proceeding on papers alone, but required a hearing.
Resolution of this question has been obviated by respondent’s election, one week after the petition, to buy petitioner’s shares under the agreement or, alternatively, under Business Corporation Law § 1118. That election, which respondent chose to make by letter to petitioner at the very outset of the dissolution proceeding — even before its answer, and unrelated to the fate of the petition — relieved petitioner of the need to prove the allegations underlying his petition (see, Matter of Gargano, 112 AD2d 225, 226; Matter of Cristo Bros., 97 AD2d *746 274, 276, affd 64 NY2d 975). As the Appellate Division noted, the trial court’s findings on the issue of wrongdoing were superfluous in light of the fact, recognized by both courts, that respondent had elected to buy petitioner’s shares pursuant to Business Corporation Law § 1118. Fixing blame is material under 1104-a, but not under 1118.
Similarly, respondent’s 1118 election makes it unnecessary for us to decide the next threshold issue raised by respondent: whether a shareholders’ agreement fixing value in and of itself precludes relief under 1104-a, because the statute provides that the court must take into account whether "liquidation of the corporation is the only feasible means whereby the petitioners may reasonably expect to obtain a fair return on their investment”. (Business Corporation Law § 1104-a [b] [1]; see also, Matter of Kemp & Beatley [Gardstein], 64 NY2d 63, 73-74, supra; Matter of Harris [Daniels Agency], 118 AD2d 646.) Upon respondent’s election, the central question in this case became one of valuation under 1118, not liquidation under 1104-a.
An 1118 election is irrevocable unless the court in its discretion determines otherwise (Business Corporation Law § 1118 [a]). Given this weighty consequence, the election should be clear and unequivocal. Here, however, respondent does not contend that its offer was hedged or conditional and therefore not an election at all (see, Matter of Barry One Hour Photo Process, 111 Misc 2d 559, 566, affd sub nom. Matter of Taines, 108 AD2d 630, appeal dismissed 66 NY2d 757, lu denied 67 NY2d 602; see also, Martin v City of Cohoes, 37 NY2d 162, 165-166). Respondent’s consistent position in this litigation undoubtedly accounts for the conclusion reached both by Supreme Court and by the Appellate Division that an election under Business Corporation Law § 1118 had in fact been made.
We therefore proceed to consider whether the value fixed in this shareholders’ agreement is alone determinative of the "fair value” of petitioner’s shares under section 1118 of the Business Corporation Law, and conclude that it is not.
Impact of the Shareholders’ Agreement on "Fair Value”
In purporting to fix the fair value of petitioner’s shares in accordance with Business Corporation Law § 1118, both the Supreme Court and the Appellate Division viewed the 1104-a petition as petitioner’s voluntary offer to sell his stock, and *747 therefore simply applied the agreed terms for a voluntary sale. Supreme Court declared that "the fair value of the stock of the petitioner is that agreed to in Section 12 (d) of the shareholders’ agreement”. The Appellate Division, in affirming, concluded that a petitioner claiming unfairness in an agreed price must show more than a disparity between that price and current value (citing Allen v Biltmore Tissue Corp., 2 NY2d 534), and that this agreement was both voluntary and unambiguous as to terms for a buyout. Finally, the court noted that, a " 'review of the record reveals that the petitioner may obtain a fair return on his investment pursuant to the buy-out provisions of the shareholder’s agreement’ (Matter of Harris [Daniels Agency], 118 AD2d 646, 647).” (133 AD2d, at 830.) Significantly, no evidence was taken on valuation.
As an abstract matter, it may well be that shareholders can agree in advance that an 1104-a dissolution proceeding will be deemed a voluntary offer to sell, or fix "fair value” in the event of judicial dissolution, and that their agreement would be enforced (see, Matter of Doniger v Rye Psychiatric Hosp. Center, 122 AD2d 873, 877, lu denied 68 NY2d 611). Participants in business ventures are free to express their understandings in written agreements, and such consensual arrangements are generally favored and upheld by the courts. (See, e.g., Zion v Kurtz, 50 NY2d 92, 102-103; Triggs v Triggs, 46 NY2d 305, 309-310; Clark v Dodge, 269 NY 410, 415.)
But in the absence of explicit agreement a shareholders’ agreement fixing the terms of a sale voluntarily sought and desired by a shareholder does not equally control when the sale is the result of claimed majority oppression or other wrongdoing — in effect, a forced buyout (Matter of Kemp & Beatley [Gardstein] 64 NY2d 63, 75, supra; see also, Matter of Sands Point Land Co. v Rossmoore, 43 Misc 2d 368, 373). Here, the shareholders’ agreement neither provided that an 1104-a dissolution proceeding would be deemed a voluntary offer to sell, nor fixed fair value in the event of an 1118 election. The buy-out provisions were explicitly limited to the desire of any party to "sell, hypothecate, transfer, encumber or otherwise dispose of’ his shares. The only event otherwise deemed a voluntary sale was the death of a stockholder. The provisions of the shareholders’ agreement regarding buyout within the first five years, at a 50% discount, were expressly limited to the situation where "a stockholder desires to sell his shares of the stock to the other stockholders” (para 12 [e]), contemplating a voluntary sale at the convenience of and for *748 the benefit of the selling shareholder, without regard to the inconvenience or detriment inflicted on the corporation or other shareholders. Similarly, paragraph 14 and schedule A by their terms dealt with the value of shares for shareholders "retiring or withdrawing from the business.” It is plain from these cited provisions that a sale occasioned by an 1104-a petition premised on abuse by the majority does not fall within the contemplation of this shareholders’ agreement regarding a sale of stock by a shareholder to the corporation.
We therefore conclude that the stipulated price of "one-half of the formula as set forth in paragraph 15” does not in and of itself dictate the "fair value” of petitioner’s shares under section 1118, and that it was error to impose those terms without further inquiry regarding valuation.
Section 1118 (b) directs that, when petitioner and the corporation cannot agree upon fair value, the court upon application of either party shall stay the 1104-a proceedings and determine fair value as of the day prior to the date on which the petition was filed. While respondent’s election and application stayed the 1104-a proceeding, and petitioner consented to the buyout (133 AD2d 829, 830, supra), no steps were taken to fix fair value. Value "should be determined on the basis of what a willing purchaser, in an arm’s length transaction, would offer for the corporation as an operating business, rather than as a business in the process of liquidation.” (Matter of Blake v Blake Agency, 107 AD2d 139, 146, Iv denied 65 NY2d 609.) In reaching such a determination, the court obviously may take into account the shareholders’ agreement provisions regarding value (see, Amodio v Amodio, 70 NY2d 5, 7), petitioner’s own offer to buy, the corporation’s alleged efforts to sell the business earlier, and any other pertinent evidence (see generally, Wimpfheimer and Dunn, Corporate Squeeze Out: Aspects of Valuation, 58 NYSBJ 32 [May 1986]). In this forced sale, the court’s objective will be to fix the value of the business as a going concern as of the day prior to the filing of the petition, which may be very different from the objective of a shareholders’ agreement fixing value for a voluntary sale.
Upon remittal, therefore, there should be further proceedings to fix the fair value of petitioner’s shares as of the day prior to the filing of the petition, as well as any other terms and conditions of the purchase of his shares.
*749 The Restrictive Covenant
While respondent in its cross motion made no argument concerning the restrictive covenant, and the trial court made no mention or evaluation of it in its decision, the judgment implemented that court’s conclusion that petitioner should be strictly bound by the shareholders’ agreement. The judgment not only incorporated the precise words of paragraph 18, but also embellished the broad restrictions of the agreement by additionally applying the clause to Pace’s new principal place of business (rather than as written), by precluding petitioner’s use of the name "Pace” in any fashion, and by forbidding any interference with existing contracts or use of confidential or proprietary information of Pace, including names of customers. The Appellate Division, also holding petitioner to the letter of the shareholders’ agreement, concluded that the restrictive covenant in the agreement was reasonable in scope and duration, and it made no comment on the restrictions added by the judgment.
The restrictive covenant found in the shareholders’ agreement is, by its terms, limited to "the sale of shares of stock as herein provided”. In that the sale of petitioner’s stock is not proceeding under the shareholders’ agreement but rather pursuant to Business Corporation Law § 1118, the express covenant is literally inapplicable. Whether or not a reasonable restriction may be imposed by way of an implied covenant in connection with a sale of goodwill (see, Mohawk Maintenance Co. v Kessler, 52 NY2d 276, 284) is an open question that must first await resolution by the trial court on remittal.
Accordingly, the Appellate Division order should be reversed, with costs, and the matter remitted to Supreme Court for further proceedings in accordance with this opinion.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order reversed, etc.

. Under the agreement, the death of a shareholder was to be deemed a voluntary offer of sale by the legal representative of all the decedent’s stock; a separate agreement was to be concluded regarding sale to the other shareholders in the event of disability.

. Petitioner initially made no response to respondent’s recitation of alleged improprieties. After the trial court’s decision, petitioner retained new counsel and sought reargument to submit his version of the facts, centering on the majority’s course of oppression after a confrontation in summer 1986. In a decision denying reargument, the court dismissed petitioner’s facts as inconsequential.